# EXHIBIT
# G

LAW OFFICES

# MILLER, ALFANO & RASPANTI, P.C.

SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED
NEW JERSEY OFFICE
25 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO:

Pennsylvania

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-TP-54421

December 21, 2001

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
:

Co-Director
Office of Information and Privacy
United States Department of Justice
Federal Building, Suite 570
Washington, DC 20530

Re: Freedom of Information Act
Appeal of Denial of FBI of
Request No. 190-TP-54421

Dear Co-Director:

We represent Donna Lee Williams, the Insurance Commissioner
for the State of Delaware, as receiver for National Heritage Life
Insurance Company ("National Heritage Life") in a civil action in
the State of Florida, captioned, Donna Lee Williams v. Prudential
Securities, Inc. and Edward Laurence McLeod, CI 96-32235. We write
to appeal a decision by Peter R. Wubberhorst, of the Tampa,
Florida Office of the Federal Bureau of Investigation ("FBI")denying our
Freedom of Information Act Request No. 190-TP-54421 for the FBI-302
Report of Edward Laurence McLeod. See Exhibit 1. In order to
assist in your prompt determination of this matter, we provide you
with the following background.

I.      MR. MCLEOD WAS INTERVIEWED BY FBI AGENTS IN MAY 1996 IN
        THE ORLANDO, FLORIDA AREA IN CONJUNCTION WITH A CRIMINAL
        INVESTIGATION

    Mr. McLeod worked for Prudential Bache Securities, now
Prudential Securities, in 1990 and 1991, where he was employed as
a broker. In 1990, Tri-Atlantic Holdings ("Tri-Atlantic"), owned

MILLER, ALFANO & RASPANTI, P.C.

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-TF-54421

Co-Director
Office of Information and Privacy
December 11, 2001
Page 2

by David L. Davies, Patrick Smythe and Lambert Aloisi, purchased National Heritage Life under fraudulent circumstances, and over the next two years looted National Heritage Life of hundreds of millions of dollars. Mr. McLeod, while a Prudential employee, was a broker for both Tri-Atlantic and National Heritage Life, after it was purchased by Tri-Atlantic. During the course of the FBI's investigation into Tri-Atlantic's principals and several others, including Shalom Weiss, for the fraudulent purchase of, and subsequent theft from, National Heritage Life, Mr. McLeod was interviewed by FBI agents in 1995.[1]  The Department of Justice indicted the three principals of Tri-Atlantic, Shalom Weiss, and others for the fraudulent purchase and looting of National Heritage Life.  All indicted parties have been tried, and all convicted individuals have been sentenced.  The only criminal case which is not fully resolved is that of Shalom Weiss, who fled the country and was sentenced in absentia.  Mr. Weiss is currently contesting extradition from Austria, where he was recently discovered by United States' authorities.

II.      TRIAL FOR NATIONAL HERITAGE LIFE'S CIVIL ACTION AGAINST PRUDENTIAL AND MR. MCLEOD IS SCHEDULED FOR MARCH, 2002, AND MR. MCLEOD'S FBI-302 REPORT IS EXTREMELY RELEVANT TO THE ISSUES WHICH WILL BE TRIED

National Heritage Life has brought suit against Prudential and Mr. McLeod on a number of theories of recovery.  In its suit, National Heritage Life alleges that Mr. McLeod was an active participant in Tri-Atlantic's fraudulent purchase of National Heritage Life in 1990.  Mr. McLeod, it is alleged, provided written and oral confirmation to the Delaware Insurance Department that Tri-Atlantic possessed assets in amounts suitable to permit Tri-Atlantic's purchase of National Heritage Life under the Rules and Regulations of the Delaware Insurance Department.  According to the suit, Mr. McLeod misled National Heritage Life and the Delaware

---

[1]   The content of this interview is not fully known to us, although solid inferences can be drawn that the interview covered Mr. McLeod's involvement with Tri-Atlantic and National Heritage Life in 1990 and 1991.

MILLER, ALFANO & RASPANTI, P.C.

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-79-54401

Co-Director
Office of Information and Privacy
December 21, 2001
Page 3

Insurance Commissioner, as Mr. McLeod was aware that Tri-Atlantic possessed only a relatively small, and grossly insufficient, amount of cash. Mr. McLeod, it is alleged, devised for Tri-Atlantic the means to mislead the Delaware Insurance Commissioner by suggesting that Tri-Atlantic purchase bonds on margin through Mr. McLeod and Prudential. This allowed Tri-Atlantic to show, on paper, that it possessed the four million dollars required by the Delaware Insurance Department before the Department would approve Tri-Atlantic's purchase of National Heritage Life.

We have, through the process of discovery, developed evidence which indicates that Mr. McLeod participated in the fraud perpetrated by Tri-Atlantic as we have indicated. We have the good faith belief that Mr. McLeod's FBI-302 contains his version of the events surrounding his involvement as Tri-Atlantic's, and later National Heritage Life's, broker and his description of the relationship between himself and the Tri-Atlantic principals.

Mr. McLeod's FBI-302 Report is a statement of a party-opponent and, therefore, is critical evidence in our case. It is instrumental in permitting us to ascertain the true relationship between Mr. McLeod and Tri-Atlantic and its principals. It is also instrumental in our pursuit of the truth from Mr. McLeod, and will be invaluable during our deposition of Mr. McLeod and at trial. The FBI-302 Report will enable us, on behalf of our client, to secure the truth of Mr. McLeod's and Prudential's role in the crimes perpetrated against National Heritage Life and its customers.

MILLER, ALFANO & RASPANTI, P.C.

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-T9-54421

Co-Director
Office of Information and Privacy
December 21, 2001
Page 4

III.    THERE WOULD APPEAR TO BE NO "ENFORCEMENT PROCEEDINGS" AT
        STAKE OR ANY OTHER BASES WHICH JUSTIFY THE FBI'S CITED
        REASONS FOR DENIAL OF THE FOIA REQUEST

     The FBI cites §§U.S.C. 552 (b)(a) and 5 U.S.C. § 552 a (j)(2)
as the basis for its denial of our FOIA request.  U.S.C.
§552(b)(7)(A) states, in relevant part:

    :        This section does not apply to matters that
             are-

                    (7) records or information compiled for
                    law enforcement purposes, but only to the
                    extent that the production of documents
                    such    law    enforcement    records    or
                    information (A) could irrevocably be
                    expected to, interfere with enforcement
                    proceedings . . . .

5 U.S.C. § 552 (b)(7) (emphasis added). "Exemption (7)(A) does not
automatically authorize the wholesale withholding of records or
information simply because the material is related to an
enforcement proceeding . . .(citations omitted). . .Rather an
agency seeking to shield records or information behind exemption
(7)(A) must show that disclosure could reasonably be expected
perceptibly to interfere with an enforcement proceeding. North v.
Wolsh, 881 F. 2d 1088 (D.C. Cir. 1989)(emphasis added). All
criminal investigations, to our knowledge, have been completed and
all individuals indicted have been either acquitted or sentenced.
Accordingly, we request that you identify how the disclosure of Mr.
McLeod's FBI-302 report could reasonably be expected perceptibly to
interfere with an enforcement proceeding, and identify which
enforcement proceeding is subject to this interference. Otherwise,
we request that you comply with our FOIA request in its entirety.

     The FBI's reliance on 5 U.S.C. §552a(j)(2) is badly misplaced.
5 U.S.C. §552a(t)(2) clearly states that "No agency shall rely on
any exemptions in this section to withhold from an individual any
record which is otherwise accessible to such an individual under
the provisions of Section 552 of this title (the Freedom from

MILLER, ALFANO & RASPANTI, P.C.

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-TP-54401

Co-Director
Office of Information and Privacy
December 21, 2001
Page 5

Information Act]". 5 U.S.C. §552a (t)(2) (emphasis added). This
has been the law since October 15, 1984, when 552a [The Privacy
Act] was amended. See United States Dep't of Justice v.
Provenzano, 469 U.S. 14, 105 S. Ct. 413 (1984) (5 U.S.C. §552a
(c)(2) then known as the Central Intelligence Information Act,
Pub.L. 98-477, §2(c), forbids an agency from using an exemption to
the Privacy Act as an exemption to the Freedom of Information Act);
see also Gonzalez v. United States Dep't of Justice, No. CIV.A. 88-
0913, 1988 WL 120841 (D.D.C., Oct. 25, 1988) (The Privacy Act, 5
U.S.C. § 552a. did not require disclosure of the requested records.
The Court then sought to determine whether any exemptions of the
Freedom of Information Act precluded disclosure).

    The FBI can only refuse our request under FOIA, since we are
not the individual who is the subject of the record, if they can
justify refusal solely on exemptions contained within FOIA. Since
the investigations and criminal prosecutions concerning the
fraudulent purchase and looting of National Heritage Life are over,
and the contents of Mr. McLeod's 1995 interview with the FBI, as
recorded in the FBI-302 report, could not possibly impact the
apprehension of Shalom Weiss, who has been convicted and sentenced,
there is no possible way that the release of Mr. McLeod's FBI-302
report could reasonably be expected to perceptibly interfere with
any enforcement proceedings.

MILLER, ALFANO & RASPANTI, P.C.

"FREEDOM OF INFORMATION APPEAL"
FROM FBI DENIAL OF REQUEST NO. 190-TF-54421

Co-Director
Office of Information and Privacy
December 21, 2001
Page 6

IV.    CONCLUSION

       Based on the foregoing, we respectfully request that the
decision denying our request for relevant information be
reconsidered and overturned. We respectfully request that the FBI
produce to us: (1) Mr. McLeod's complete FBI-302 Report; (2) a copy
of all other related documents responsive to our FOIA request, with
any redaction necessary to protect the FBI's interests; and/or (3)
an explanation of how the disclosure of these documents, or the
redacted portions thereof, could reasonably be expected to
interfere with an enforcement proceeding, so that the FBI reliance
on the stated exemption is justified.  We deem this information
crucial to the Delaware Insurance Commissioner's search for the
truth behind her allegations, and we will pursue all legitimate
avenues of recourse if this appeal is denied.


                          Very truly yours,


                          KEVIN E. RAPHAEL


KER/dd

APR-29-2003  15:10        FOIPA DISCLOSURE 3                        202 220 1713    P.02/21

# EXHIBIT
# H

U.S. Department of Justice

Office of Information and Privacy

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

March 6, 2002

Kevin E. Raphael, Esq.
Miller, Alfano & Raspanti, PC
Suite 3402
1818 Market Street
Philadelphia, PA  19103

     Re:    Request No. 190-TP-54421 - Edward Laurence McLeod

Dear Mr. Raphael:

     This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation on your request for information from the files of the Department of Justice was received by this Office on February 7, 2002.

     The Office of Information and Privacy, which has the responsibility of adjudicating such appeals, has a substantial backlog of pending appeals received prior to yours.  In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.  Your appeal has been assigned number 02-0802.  Please mention this number in any future correspondence to this Office regarding this matter.

     We will notify you of the decision on your appeal as soon as we can.  The necessity of this delay is regretted and your continuing courtesy is appreciated.

     Sincerely,

     Claudia J. Tweed
     Chief, Administrative Unit

MAR 2 1 2002



**U.S. Department of Justice**

Office of Information and Privacy

---

Telephone: (202) 514-3642

*Washington, D.C. 20530*

JUL - 1

Kevin E. Raphael
Miller, Alfano & Raspanti, P.C.
1818 Market Street          Re: Appeal No. 02-0802
Philadelphia, PA 19103          RLH:ADW:RK

Dear Mr. Raphael:

You appealed on behalf of your client, Donna Lee Williams, from the action of the Tampa Field Office of the Federal Bureau of Investigation on her request for access to records concerning Edward Laurence McLeod.

After carefully considering your appeal, I have decided to affirm the FBI's action on your client's request.

Without an individual's consent, proof of death, or an overriding public interest, the disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy. 5 U.S.C. 552(b)(7)(C). I have also determined that this information is not appropriate for discretionary release. Please be advised that the consent form you submitted authorizing Mr. McLeod's attorney access to his records is insufficient. You must submit a waiver executed by Mr. McLeod authorizing the Tampa Field Office to release the requested records to you.

If your client is dissatisfied with my action on your appeal, she may seek judicial review in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Richard L. Huff
Co-Director

*FBI*

# EXHIBIT
# I

OPCA-16 (8-11-98)



**U.S. Department of Justice**

Federal Bureau of Investigation
935 Pennsylvania Ave., N.W.

Washington, D.C. 20535-0001

Michael Wolensky
Kutak Rock, LLP                                          August 9, 2002
Suite 2100
225 Peachtree Street, N.E.          Subject of Request. __Edward L. McLeod__
Atlanta, Georgia  30303-1731
                                    FOIPA No. _____ /190- TP-54421

Dear Requester:

Enclosed are copies of documents from FBI records. Excisions have been made to protect information exempt from disclosure pursuant to Title 5, United States Code, Section 552 (Freedom of Information Act) and/or Section 552a (Privacy Act). In addition, where excisions were made, the appropriate exempting subsections have been cited opposite the deletions. Where pages have been withheld in their entirety, a deleted page information sheet has been substituted showing the reasons or basis for the deletion. The subsections cited for withholding information from the enclosed documents are marked below:

### Section 552

| | | | Section 552a |
|---|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | | ☐ (j)(2) |
| ☐ (b)(3) _____ | ☒ (b)(7)(C) | | ☐ (k)(1) |
| _____ | ☐ (b)(7)(D) | | ☐ (k)(2) |
| _____ | ☐ (b)(7)(E) | | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | | ☐ (k)(6) |
| ☐ (b)(6) | | | ☐ (k)(7) |

(See Form OPCA-16a, enclosed, for an explanation of these exemptions.)

Pursuant to your request, __5_____ pages(s) were reviewed and __5_____ page(s) are being released.

During the review of material pertinent to the subject of your request, documents were located which

☐ originated with another Government agency(ies).
    These documents were referred to that agency(ies) for review and direct response to you.

☐ contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

☒ If you desire, you may appeal any denials contained herein. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530-0001 within sixty days from receipt of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject of your request was the subject of the investigation. There are additional references to the subject(s) of your request in files relating to other individuals, organizations, events or activities. These additional mentions or references have not been reviewed to determine if, in fact, they are identifiable with the subject(s) of your request. Our experience has shown that such references are frequently similar to information contained in the processed main file(s). We will process these references if you now make a specific request for them. However, because of a significant increase in FOIPA requests and an expanding backlog, we have given priority to the processing of main investigative files and can only complete the processing of these additional references as time and resources permit.

☒ See additional information which follows.

Sincerely yours,

*Robert Moran/DCR*

Chief
Freedom of Information-
Privacy Acts Section
Office of Public and Congressional Affairs

Enclosures ( 2 )

      This is in response of your Freedom of Information/Privacy Act (FOI/PA) request regarding a Mr. Edward Lawrence McLeod's FBI 302 interview.

      A search of the Tampa Central Record System located the FBI 302 responsive to your request. Please be advised that the enclosed documents contain deletions exempt from disclosure pursuant to subsection Title 5, United States Code, § 552 (b)(7)(C). See enclosed Form OPCA-16a, for an explanation of this exemption.

# Freedom of Information and Privacy Acts

SUBJECT <u>Mr. Edward L. McLeod</u>

FILE NUMBER <u>196A-TP-32283-173</u>



# Federal Bureau of Investigation

## MEMORANDUM OF INTERVIEW

DATE OF INTERVIEW           :        May 11, 1995

PLACE OF INTERVIEW          :        Smith Barney Inc.
                                     501 S. New York Avenue
                                     Winter Park, FL 32789

PERSON INTERVIEWED          :        Larry McLeod

INTERVIEWED BY              : b7C    ███████████ S/A FBI

                                     Postal Inspector


b7C

On May 11, 1995, Larry McLeod, Investment Broker, Smith Barney Inc., was interviewed at his office at 501 S. New York Avenue, Winter Park, FL 32789.  Mr. McLeod was accompanied by ████████ ███████████ Smith Barney Inc.  McLeod was advised the purpose of the interview concerned his past association with Tri-Atlantic Holdings, ████████████ and ███████████

Mr. McLeod stated he first met ███████████ while he (McLeod) was working for Prudential Bache Securities.  He said he met through one of his clients, Steve Baker & Associates.  Steve Baker & Associates is a public relations firm and also represented ██████ ████████ owner of ██████ McLeod said ████████ brought ███ ██████ to Steve Baker & Associates. ███████████ was working for ████████████ but was also ███████████ Steve Baker & Associates.  It was through Steve Baker & Associates that McLeod

*Memo of*
*Interview*
*Larry McLeod*

*—index*

19bA-TP-32283-173

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____

░░ 0 ░ 1995

FBI-TAMPA

R4

## MEMORANDUM OF INTERVIEW

DATE OF INTERVIEW            :        May 11, 1995

PLACE OF INTERVIEW           :        Smith Barney Inc.
                                      501 S. New York Avenue
                                      Winter Park, FL 32789

PERSON INTERVIEWED           :        Larry McLeod

INTERVIEWED BY               :    b7C  ███████████  S/A FBI

                                      Postal Inspector

On May 11, 1995, Larry McLeod, Investment Broker, Smith Barney Inc., was interviewed at his office at 501 S. New York Avenue, Winter Park, FL 32789  Mr. McLeod was accompanied by ████████ Smith Barney Inc.  McLeod was advised the purpose of the interview concerned his past association with Tri-Atlantic Holdings, ████████████ and ████████████

Mr. McLeod stated he first met ████████████ while he (McLeod) was working for Prudential Bache Securities.  He said he met ████ through one of his clients, Steve Baker & Associates.  Steve Baker & Associates is a public relations firm and also represented ████████ b7C ████, owner of ████████  McLeod said ████████████ brought to Steve Baker & Associates.  ████████████ was working for ████ but was ████████████ Steve Baker & Associates.  It was through Steve Baker & Associates that McLeod met ████.  McLeod stated, that sometime later, the relationship between ████████ and Baker & Associates soured and ████ left.  Also McLeod stated it was in the newspaper that ████ had accused ████████████ of some type of embezzlement.

McLeod stated, subsequent to the initial meeting, ████████████ told McLeod he was going to purchase a local insurance company with ████  He recalled ████████ and ████ came to see him at his Prudential Bache office.  McLeod stated he was told by ████ and ████████  they needed to buy up to $5 million is U. S. government notes.  ████ and ████ opened an account at Prudential Bache in the name of Tri-Atlantic Holdings.  Their initial deposit was approximately $525,000.00.  This occurred on or about July 9, 1990. McLeod state what ████ and ████ wanted to do was leverage the purchase of the U. S. government notes using their initial $525,000.00 deposit.  McLeod recalled he told them about purchasing bonds that accrued interest.  This meant government bonds which pay interest every six months, have an accrued interest and the accrued amount of interest depends on how long after the last interest was

1

paid. ███████ and ████████ made it clear to McLeod they wanted to purchase notes that had the least amount of accrued interest. In other words, they wanted the highest dollar volume of government notes available with the least amount of accrued interest on them. McLeod stated he researched the Wall Street Journal and eventually found a series of notes that could be bought with the $525,000.00. These notes had a value of approximately $4.5 million with little accrued interest. McLeod stated these are the Treasury Notes that ████████ and ██████ were looking for. McLeod stated he purchased the notes in mid-July 1990 and sold them several weeks later. He thought ████████ and ████████ made approximately $40,000 to $50,000 in that two week period.

McLeod was shocked to learn ██████ and ████████ had used the letter to Tri-Atlantic to represent to Delaware that they actually had $4.5 million cash. He said this was the only time in twelve years as a stock broker that he was ever asked to write this kind of letter. McLeod stated, had ████████████ or anyone else called and asked about the letter prior to the sale, he would have discussed it and told them the $4.5 million was on margin. He also recalled ██████ told him that he (McLeod) was the only person he knew in the securities business that's why they went to him. Also McLeod stated when the initial account was opened at Prudential Bache, even though █████████ appeared to be in charge, it was █████████ wrote the check for the initial deposit. McLeod stated this was the only time he met ██████████████.

McLeod stated after he purchased the Treasury notes for █████████ and ████████ asked him to write a letter stating Tri-Atlantic Holdings had $4.5 million in Treasury notes. McLeod stated he did this for ████████ because ███████ was his client. It was McLeod's understanding this letter may have been used to give to the insurance company ████████ and ███████ were going to purchase. McLeod stated ████████ also told him that once they closed on the insurance company deal, the insurance company would use McLeod and Prudential Bache to purchase their corporate bonds.

Subsequent to the purchase and sales of Treasury notes, McLeod stated he began to purchase corporate bonds for National Heritage Life Insurance Company. He thought it was at this time he first began to communicate with █████████████ National Heritage. McLeod recalled he would find corporate bonds for National Heritage to purchase and fax a list of these bonds to ████████ and/or █████████ It was McLeod recollection that both ██████ and ████████ had to approve which bonds would be purchased. McLeod thought the first bonds he purchased for National Heritage were Chrysler Motors. McLeod stated after the closing of the insurance company purchase, he went to Maitland where he met ████████████████ introduced McLeod to ██████ saying she would be working with McLeod and ████████ to buy National Heritage corporate bonds. McLeod stated he set up two accounts for National Heritage, one in the name of National Heritage and the second in the name of

2

APR-29-2003 16:08        FOIPA DISCLOSURE 3        202 220 1713    P.06/07

Reliance Standard Life Insurance Company (National Heritage Insurance Life Company in trust for Reliance Standard Life Insurance). McLeod stated he made purchases through the National Heritage account but there were no trades under Reliance Standard.

McLeod stated he was asked by NHLIC to search for certain corporate grade bonds. He stated the requirement was the amount the bonds paid was greater than the amount the National Heritage Life Annuity programs were paying. McLeod state he would research and fax a list of his possible buys to ▮▮▮▮▮ It was his understanding this list would then faxed to a "Board in Chicago" for approval. McLeod stated usually within one hour he would know which ones he was to buy. He said ▮▮▮▮▮ would call and advise him which bonds to purchase. McLeod stated he never talked to ▮▮▮▮ about the margin account (the leverage buy of U. S. Treasury notes) or the letter he wrote to Tri-Atlantic Holdings regarding the $4.5 million. McLeod doubted ▮▮▮▮▮▮ knew anything about the margin purchase or the letter.

McLeod stated sometime later he received a call from ▮▮▮▮▮ who said the State of Delaware regulators had shown up to determine how the monies of National Heritage were invested. ▮▮▮▮ told them Delaware stated either ▮▮▮▮▮ had to leave or Delaware was going to close National Heritage. McLeod stated ▮▮▮▮ told him the State of Delaware believed ▮▮▮ was taking too much risk with National Heritage money. Further, ▮▮▮ instructed him not to issue any checks payable to ▮▮▮▮▮▮

b7C

After ▮▮▮▮ fell from grace at National Heritage, McLeod stated he was called by ▮▮▮ and ▮▮▮▮ and told his services were no longer needed. McLeod was advised to transfer all the accounts and money to Bear Stearns in New York. This also included a $13 million to $14 million bond which McLeod had recently purchased at the instruction of ▮▮▮▮▮ McLeod could not recall which broker at Bear Stearns got the account but stated he was an "institutional buyer". McLeod stated the reason he was asked to transfer all accounts was ▮▮▮▮ and ▮▮▮▮ told him "we don't think you are doing enough for us". McLeod thought this was strange because he was buying high yield bonds to offset the high payout of the annuities. He recalled he was told to buy anything paying 10 1/2% or more which is what he did. McLeod recalled on one or two occasions he was asked to transfer money to someone named ▮▮▮▮ in New York. McLeod stated he never met

McLeod stated, while he was handling the accounts of National Heritage, he received between $75,000 and $80,000 in gross commissions. He said while he was handling the accounts, ▮▮▮▮ once made the remark to him that "they are putting pressure on me to transfer the money to Paine Webber because ▮▮▮▮ has a contact there". McLeod stated, after ▮▮▮▮ left, ▮▮▮▮ took over running the National Heritage Life Insurance Company. For some reason this seemed strange to McLeod. McLeod stated he never knew

APR-29-2003  16:08          FOIPA DISCLOSURE 3                    202 220 1713    P.07/07

b7C

McLeod was then shown a copy of a new account record for Prudential
Bache in the name of Tri-Atlantic Holdings Limited.    McLeod
recognized this as a copy of the application he took on July 9,
1990.   McLeod was also shown Prudential Bache monthly statements
for July and August 1990.    McLeod pointed out the original
$525,000.00 investment was put into a money market fund.    On July
17, 1990, the money was taken from the money market fund and used
to purchase $4.5 million in U. S. Treasury notes.   The statements
further indicate, on August 2, 1990, the U. S. Treasury notes were
sold.   McLeod then provided copies of new account records in the
name of National Heritage Life Insurance Company and also in the
name of National Heritage Life Insurance Company ITF Reliance
Standard Life Insurance Company.

At the end of the interview, McLeod provided the following personal
information:

              NAME:       Edward L. McLeod III
              ADDRESS:    1820 Legion Drive, Winter Park, FL 32792
              DOB:        10/15/48
              SSN:        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
              PHONE:      (407)623-5600 work
                          (407)647-5660 home

Postal Inspector

b7C

S/A FBI

4

TOTAL P.07

# EXHIBIT
# J

LAW OFFICES

## MILLER, ALFANO & RASPANTI, P.C.

SUITE 3402
1818 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19103
(215) 972-6400

AFFILIATED
NEW JERSEY OFFICE
25 CHESTNUT STREET, SUITE 105
HADDONFIELD, NEW JERSEY 08033
(856) 354-0955

PENNSYLVANIA FAX: (215) 981-0082
NEW JERSEY FAX: (856) 354-0918

REPLY TO:
Pennsylvania

September 19, 2002

VIA HAND DELIVERY

Ralph J. Saturno, Jr., Esquire
Chief Division Counsel
Federal Bureau of Investigation
William J. Green Federal Bldg.
600 Arch Street, 8th Floor
Philadelphia, PA  19106

Re:  Kevin E. Raphael, Esquire v.
     United States Department of Justice
     USDC, E.D. of Pa., Civil Action No. 02-3808

Dear Mr. Saturno:

I write concerning the above-captioned matter. Several weeks ago, I spoke to you to request that the FBI release a complete, unredacted version of the FBI-302 report containing the statement of Edward Laurence McLeod. In the redacted version provided under the above-captioned FOIA request, the government had redacted the names of "David Davies" and "Patrick Smythe." You informed me that if I was able to obtain privacy waivers from Mr. Davies or Mr. Smythe, or both, you would release another version of the FBI-302 report.

Based on that conversation, I have obtained a waiver of privacy from Patrick Smythe, the original of which I enclose. Please provide, at your earliest convenience, another version of the FBI-302 report of Mr. McLeod which leaves unredacted Mr. Smythe's name where it appears.

MILLER, ALFANO & RASPANTI, P.C.

Ralph J. Saturno, Esquire
Chief Division Counsel
Federal Bureau of Investigation
September 19, 2002
Page 2


        Thank you very much for your cooperation and consideration.
If you have any questions, please do not hesitate to call.

                        Very truly yours,


                        KEVIN E. RAPHAEL

KER/ksh
encl.
cc:  Susan Shinkman, AUSA (w/encl.)
F:\PBL\Ker\WHL\Prudential\Sartano ltr 01.wpd

PRIVACY WAIVER AND CERTIFICATION OF IDENTITY

FULL NAME: PATRICK C. SMYTHE

CURRENT ADDRESS: PENSACOLA FEDERAL PRISON CAMP, PENSACOLA, FL

DATE OF BIRTH: 7-8-45          PLACE OF BIRTH: TULSA, OKLA.

     Under penalty of perjury, I hereby declare that I am the person named above and I understand that any falsification of this statement is punishable under provisions of Title 18, United States Code (U.S.C.) Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than 5 years, or both; and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of Title 5, U.S.C., Section 552a(i)(3) as misdemeanor and by a fine of not more than $5,000. I hereby waive my right to privacy, and I authorize the FBI to release any and all information relating to me to: Kevin E. Raphael, Esquire, at Miller, Alfano & Raspanti, P.C.

Your Signature: _Patrick Smythe_

Subscribed and sworn to before me this 29 day of August, 2002

Signature of Notary: _Lauren P Lee_

My Commission Expires: 4-1-2006

Notary Seal or Stamp:

LAUREN P. LEE
MY COMMISSION # DD 10S174
EXPIRES: April 1, 2006
Bonded Thru Notary Public Underwriters

State Of Florida
County Of Escambia

# EXHIBIT
# K

OPCA-16 (8-11-98)



**U.S. Department of Justice**

OCT 2 4 2002

Federal Bureau of Investigation
935 Pennsylvania Ave., N.W.

Washington, D.C. 20535-0001

Mr. Kevin E. Raphael, Esq.
Miller, Alfano & Raspanti, P.C.
Suite 3402
1818 Market Street
Philadelphia, Pennsylvania 19103

Subject of Request: __Edward L. McLeod__

FOIPA No. _____ /190- TP-54421

Dear Requester:

Enclosed are copies of documents from FBI records. Excisions have been made to protect information exempt from disclosure pursuant to Title 5, United States Code, Section 552 (Freedom of Information Act) and/or Section 552a (Privacy Act). In addition, where excisions were made, the appropriate exempting subsections have been cited opposite the deletions. Where pages have been withheld in their entirety, a deleted page information sheet has been substituted showing the reasons or basis for the deletion. The subsections cited for withholding information from the enclosed documents are marked below:

|  | **Section 552** | | **Section 552a** |
|---|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | | ☐ (j)(2) |
| ☐ (b)(3) _____ | ☒ (b)(7)(C) | | ☐ (k)(1) |
| _____ | ☐ (b)(7)(D) | | ☐ (k)(2) |
| _____ | ☐ (b)(7)(E) | | ☐ (k)(3) |
| _____ | ☐ (b)(7)(F) | | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | | ☐ (k)(6) |
| ☐ (b)(6) | | | ☐ (k)(7) |

(See Form OPCA-16a, enclosed, for an explanation of these exemptions.)

Pursuant to your request, __5__ pages(s) were reviewed and __5__ page(s) are being released.

During the review of material pertinent to the subject of your request, documents were located which

☐ originated with another Government agency(ies).
   These documents were referred to that agency(ies) for review and direct response to you.

☐ contain information furnished by another Government agency(ies). You will be advised by the FBI as to the releasability of this information following our consultation with the other agency(ies).

☐ If you desire, you may appeal any denials contained herein. Appeals should be directed in writing to the Co-Director, Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530-0001 within sixty days from receipt of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal" or "Information Appeal." Please cite the FOIPA number assigned to your request so that it may be easily identified.

☐ The enclosed material is from the main investigative file(s) in which the subject of your request was the subject of the investigation. There are additional references to the subject(s) of your request in files relating to other individuals, organizations, events or activities. These additional mentions or references have not been reviewed to determine if, in fact, they are identifiable with the subject(s) of your request. Our experience has shown that such references are frequently similar to information contained in the processed main file(s). We will process these references if you now make a specific request for them. However, because of a significant increase in FOIPA requests and an expanding backlog, we have given priority to the processing of main investigative files and can only complete the processing of these additional references as time and resources permit.

☒ See additional information which follows.

Sincerely yours,

/S/

Chief
Freedom of Information-
 Privacy Acts Section
Records Management Division

Enclosures ( 1 )

     Please be advised, pursuant to the privacy waiver of Mr. Patrick Smythe, additional information is being released to you at this time.

## MEMORANDUM OF INTERVIEW

DATE OF INTERVIEW          :      May 11, 1995

PLACE OF INTERVIEW        :      Smith Barney Inc.
                                   501 S. New York Avenue
                                   Winter Park, FL 32789

PERSON INTERVIEWED        :      Larry McLeod

INTERVIEWED BY            :    ████████ S/A FBI    **b7C-1**
                                          **b7C-2**
                        Postal Inspector

On May 11, 1995, Larry McLeod, Investment Broker, Smith Barney Inc., was interviewed at his office at 501 S. New York Avenue, Winter Park, FL 32789.  Mr. McLeod was accompanied by ████ ████████████ Smith Barney Inc.  McLeod was advised the purpose of the interview concerned his past association with Tri-Atlantic Holdings, ████████████ and Patrick Smythe.

**b7C-3**

Mr. McLeod stated he first met ████████████ while he (McLeod) was working for Prudential Bache Securities.  He said he met ████ through one of his clients, Steve Baker & Associates.  Steve Baker & Associates is a public relations firm and also represented ████ ████ owner of ████████  McLeod said ████████ brought ████ to Steve Baker & Associates.  ████████ was working for ████ but was also ████████████████ Steve Baker & Associates.  It was through Steve Baker & Associates that McLeod

*Memo of Interview Larry McLeod — 4×index*

*196A-TP-32083-173*

SEARCHED _____ _____
SERIALIZED _____ _____
█ █ █ 1995
FBI-13MPA

*R4*

MEMORANDUM OF INTERVIEW

DATE OF INTERVIEW          :      May 11, 1995

PLACE OF INTERVIEW         :      Smith Barney Inc.
                                  501 S. New York Avenue
                                  Winter Park, FL 32789

PERSON INTERVIEWED         :      Larry McLeod

INTERVIEWED BY             :      ████████ S/A FBI      b7C-1
                                  ████████              b7C-2
                                  Postal Inspector

On May 11, 1995, Larry McLeod, Investment Broker, Smith Barney Inc., was interviewed at his office at 501 S. New York Avenue, Winter Park, FL 32789. Mr. McLeod was accompanied by ████████ ████████ Smith Barney Inc. McLeod was advised the purpose of the interview concerned his past association with Tri-Atlantic Holdings, ████████ and Patrick Smythe.

Mr. McLeod stated he first met ████████ while he (McLeod) was working for Prudential Bache Securities. He said he met ████████ through one of his clients, Steve Baker & Associates. Steve Baker & Associates is a public relations firm and also represented ████████ owner of ████████ McLeod said ████████ brought ████████ to Steve Baker & Associates. ████████ was working for ████████ but was ████████ Steve Baker & Associates. It was through Steve Baker & Associates that McLeod met ████████ McLeod stated, that sometime later, the relationship between ████████ and Baker & Associates soured and ████████ left. Also McLeod stated it was in the newspaper that ████████ had accused ████████ of some type of embezzlement.       b7C-3

McLeod stated, subsequent to the initial meeting, ████████ told McLeod he was going to purchase a local insurance company with Patrick Smythe. He recalled ████████ and Smythe came to see him at his Prudential Bache office. McLeod stated he was told by ████████ and Smythe, they needed to buy up to $5 million is U. S. government notes. ████████ and Smythe opened an account at Prudential Bache in the name of Tri-Atlantic Holdings. Their initial deposit was approximately $525,000.00. This occurred on or about July 9, 1990. McLeod state what Smythe and ████████ wanted to do was leverage the purchase of the U. S. government notes using their initial $525,000.00 deposit. McLeod recalled he told them about purchasing bonds that accrued interest. This meant government bonds which pay interest every six months, have an accrued interest and the accrued amount of interest depends on how long after the last interest was

1

paid. ████ and Smythe made it clear to McLeod they wanted to purchase notes that had the least amount of accrued interest. In other words, they wanted the highest dollar volume of government notes available with the least amount of accrued interest on them. McLeod stated he researched the Wall Street Journal and eventually found a series of notes that could be bought with the $525,000.00. These notes had a value of approximately $4.5 million with little accrued interest. McLeod stated these are the Treasury Notes that Smythe and ████ were looking for. McLeod stated he purchased the notes in mid-July 1990 and sold them several weeks later. He thought ████ and Smythe made approximately $40,000 to $50,000 in that two week period.

McLeod was shocked to learn ████ and Smythe had used the letter to Tri-Atlantic to represent to Delaware that they actually had $4.5 million cash. He said this was the only time in twelve years as a stock broker that he was ever asked to write this kind of letter. McLeod stated, had ████ or anyone else called and asked about the letter prior to the sale, he would have discussed it and told them the $4.5 million was on margin. He also recalled told him that he (McLeod) was the only person he knew in the securities business that's why they went to him. Also McLeod stated when the initial account was opened at Prudential Bache, even though ████ appeared to be in charge, it was Patrick Smythe wrote the check for the initial deposit. McLeod stated this was the only time he met Patrick Smythe.

McLeod stated after he purchased the Treasury notes for ████ and Smythe, ████ asked him to write a letter stating Tri-Atlantic Holdings had $4.5 million in Treasury notes. McLeod stated he did this for ████ because ████ was his client. It was McLeod's understanding this letter may have been used to give to the insurance company ████ and Smythe were going to purchase. McLeod stated ████ also told him that once they closed on the insurance company deal, the insurance company would use McLeod and Prudential Bache to purchase their corporate bonds.

Subsequent to the purchase and sales of Treasury notes, McLeod stated he began to purchase corporate bonds for National Heritage Life Insurance Company. He thought it was at this time he first began to communicate with ████ McLeod recalled he would find corporate bonds for National Heritage to purchase and fax a list of these bonds to ████ It was McLeod recollection that both ████ and/or ████ and ████ had to approve which bonds would be purchased. McLeod thought the first bonds he purchased for National Heritage were Chrysler Motors. McLeod stated after the closing of the insurance company purchase, he went to Maitland where he met ████ introduced McLeod to ████ saying she would be working with McLeod and ████ to buy National Heritage corporate bonds. McLeod stated he set up two accounts for National Heritage, one in the name of National Heritage and the second in the name of

b7C-

2

Reliance Standard Life Insurance Company (National Heritage Life Insurance Life Company in trust for Reliance Standard Life Insurance). McLeod stated he made purchases through the National Heritage account but there were no trades under Reliance Standard.

McLeod stated he was asked by NHLIC to search for certain corporate grade bonds. He stated the requirement was the amount the bonds paid was greater than the amount the National Heritage Life Annuity programs were paying. McLeod state he would research and fax a list of his possible buys to ████████ It was his understanding this list would then faxed to a "Board in Chicago" for approval. McLeod stated usually within one hour he would know which ones he was to buy. He said ████████████ would call and advise him which bonds to purchase. McLeod stated he never talked to ██████ about the margin account (the leverage buy of U. S. Treasury notes) or the letter he wrote to Tri-Atlantic Holdings regarding the $4.5 million. McLeod doubted ██████████knew anything about the margin purchase or the letter.

McLeod stated sometime later he received a call from ████████who said the State of Delaware regulators had shown up to determine how the monies of National Heritage were invested. ████████told them Delaware stated either ████████████had to leave or Delaware was going to close National Heritage. McLeod stated ██████told him the State of Delaware believed ████████was taking too much risk with National Heritage money. Further, ████████instructed him not to issue any checks payable to ████████

After ██████████fell from grace at National Heritage, McLeod stated he was called by ████████and Pat Smythe and told his services were no longer needed. McLeod was advised to transfer all the accounts and money to Bear Stearns in New York. This also included a $13 million to $14 million bond which McLeod had recently purchased at the instruction of ████████████ McLeod could not recall which broker at Bear Stearns got the account but stated he was an "institutional buyer". McLeod stated the reason he was asked to transfer all accounts was ████████and Smythe told him "we don't think you are doing enough for us". McLeod thought this was strange because he was buying high yield bonds to offset the high payout of the annuities. He recalled he was told to buy anything paying 10 1/2% or more which is what he did. McLeod recalled on one or two occasions he was asked to transfer money to someone named ████████in New York. McLeod stated he never met ██████

McLeod stated, while he was handling the accounts of National Heritage, he received between $75,000 and $80,000 in gross commissions. He said while he was handling the accounts, ████████once made the remark to him that "they are putting pressure on me to transfer the money to Paine Webber because Smythe has a contact there". McLeod stated, after ████████left, Pat Smythe took over running the National Heritage Life Insurance Company. For some reason this seemed strange to McLeod. McLeod stated he never knew

b7C

3

b7C-3

McLeod was then shown a copy of a new account record for Prudential
Bache in the name of Tri-Atlantic Holdings Limited.  McLeod
recognized this as a copy of the application he took on July 9,
1990.  McLeod was also shown Prudential Bache monthly statements
for July and August 1990.  McLeod pointed out the original
$525,000.00 investment was put into a money market fund.  On July
17, 1990, the money was taken from the money market fund and used
to purchase $4.5 million in U. S. Treasury notes.  The statements
further indicate, on August 2, 1990, the U. S. Treasury notes were
sold.  McLeod then provided copies of new account records in the
name of National Heritage Life Insurance Company and also in the
name of National Heritage Life Insurance Company ITF Reliance
Standard Life Insurance Company.

At the end of the interview, McLeod provided the following personal
information:

                NAME:     Edward L. McLeod III
                ADDRESS:  1820 Legion Drive, Winter Park, FL 32792
                DOB:      10/15/48
                SSN:      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
                PHONE:    (407)623-5600 work
                          (407)647-5660 home

Postal Inspector

b7C-2

b7C-1

S/A FBI

4

TOTAL P.21

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of April, 2003, a true and correct copy of the foregoing Declaration of Carol L. Keeley was hand delivered to:

Kevin E. Raphael, Esquire
Miller, Alfano & Raspanti, PC
Suite 3402
1818 Market Street
Philadelphia, PA 19103


SUSAN SHINKMAN
Assistant United States Attorney